**Dated: December 19, 2008**
**The following is ORDERED:**



*Tom R. Cornish*
UNITED STATES BANKRUPTCY JUDGE

_____

NOT FOR PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:

**Walter Crabtree**,  Case No. 06-80540
**Darlene Crabtree,**  Chapter 7

       Debtors.


**Walter Crabtree**,
**Darlene Crabtree**,

       Plaintiffs,

vs.  Adv. No. 07-08024

**First National Bank of Stigler**,

       Defendant.

<u>OPINION</u>

This adversary proceeding came on for trial before this Court on November 3, 2008.

Appearances were entered by Jerry Gunter, attorney for the Plaintiffs Walter and Darlene

EOD 12/19/08 by tc

Crabtree, and Thomas Webb, attorney for Defendant First National Bank of Stigler. The Defendant moved for a directed verdict after it rested. The Court denied that motion. After reviewing the evidence and testimony, this Court does hereby enter the following findings and conclusions in conformity with Rule 7052, Fed. R. Bankr. P., in this core proceeding.

FINDINGS OF FACT

Plaintiffs, Walter and Darlene Crabtree, were owners of WCW Excavating, Inc. ("WCW"), an Oklahoma corporation located in Stigler, Oklahoma. Mrs. Crabtree was president of WCW.[1] WCW was in the business of burying underground cables, and was offered work consisting of hauling trash, debris removal, and other clean-up work in Louisiana and Mississippi after Hurricane Katrina. WCW was to partner with Kevin Simpson and Rodney Silver of Texas on the hurricane clean-up, but the group needed three trailers to be able to do this work. On behalf of WCW, Walter Crabtree sought a loan of $ 60,000 from Defendant-Creditor, First National Bank of Stigler, ("Bank") to purchase these trailers. The Bank required additional collateral beyond a purchase money security interest in the trailers before it would approve the loan.

Plaintiffs met Mr. Simpson prior to November 18, 2005, and were given a Bill of Sale, purportedly signed by Rodney Silver, conveying to WCW "for value received" the following equipment: a Vermeer drill, a trailer, a mixer, and a pothole machine. In reality, WCW never paid anyone anything for the equipment listed in the Bill of Sale, nor did it or the Plaintiffs ever take physical possession of any of this equipment. Plaintiff Walter

---

[1] In addition to being President of WCW, Mrs. Crabtree works as a beautician.

Crabtree presented this Bill of Sale to the Bank, representing that WCW owned this equipment and was pledging it as additional collateral on the loan for the trailers. After satisfying itself as to the value of this equipment and Plaintiffs' ownership of it, the Bank agreed to make the loan. Plaintiff Darlene Crabtree signed all of the loan documents as President of WCW.

The Plaintiffs took the loan proceeds to Texas where they purchased the three trailers. Mr. Simpson met them in Texas and gave them a contract between himself, Silver Underground Inc., and WCW, purportedly signed by Mr. Simpson and Rodney R. Silver as President of Silver Underground, Inc.. The contract stated that Silver Underground and Simpson were agreeing to pledge their equipment as collateral on the loan to WCW for the purchase of three trailers for trash removal in Louisiana. The contract valued the pledged equipment at $60,000.[2] The contract also provided that WCW would make the payments on the loan to purchase the three trailers, and that after the loan was paid off, WCW would release all claims to the pledged collateral, transfer title of one trailer to Simpson, and transfer title to another trailer to Silver. The Plaintiffs refused to sign this contract because they did not agree to its terms. The Bank was never notified about this contract nor was it ever told that Simpson and Silver were involved with WCW until after WCW defaulted.

Walter Crabtree, Simpson, and Silver traveled to Louisiana with the three new trailers purchased with the loan proceeds obtained by WCW. Unfortunately, the promised

---

[2]Mr. Crabtree estimated that the equipment was only worth between $15,000 and $20,000. However, Bank officer Mike Butler testified that both he and Mr. Crabtree agreed that the equipment was worth approximately $50,000.

3

work never really materialized. Simpson and Silver left Louisiana after approximately three weeks. Mr. Crabtree stayed on awhile longer but eventually he returned to Oklahoma. WCW defaulted on its loan. The Bank was able to recover two of the three new trailers, and received insurance proceeds on the third trailer that had been stolen. However, the equipment from Silver and Simpson was not turned over to the Bank. Mr. Crabtree testified that he traveled to Texas to pick up the equipment but was unable to find it, or to locate Mr. Silver. He also stated that he did not have the ability to pick up and deliver the equipment to the Bank if it was ever found.

On August 7, 2006, Mr. and Mrs. Crabtree filed their Chapter 7 personal bankruptcies in this Court. They listed the Bank as a creditor on the WCW loan. The equipment pledged as additional collateral on the WCW loan was not listed as property of the Crabtrees' bankruptcy estate.

On August 11, 2006, the Bank filed a replevin action against WCW in the District Court of Haskell County, Oklahoma, CJ-2006-164. The case was assigned to Judge Danita Williams. Service was made on Mrs. Crabtree. WCW filed an Objection to the action, stating that it was not in possession of the property but that the property was in Rod Silver's possession at the listed address in Irving, Texas. Judge Williams held a hearing on September 5, 2006, on the Petition for Replevin and Objection. Judge Williams testified to this Court that she was aware that the Crabtrees had filed personal bankruptcy but that neither of them was a party to the replevin action. She also testified that she never presided over any proceedings against the Crabtrees personally. Judge Williams stated that the evidence presented to her was that there was no dispute between the Bank and WCW that the Bank was entitled to the equipment listed in the Petition for Replevin, but

4

Case 07-08024    Doc 81    Filed 12/19/08    Entered 12/19/08 11:04:36    Desc Main
Document    Page 4 of 17

that WCW had not turned over all of the equipment to the Bank. She also recalled that there was substantial testimony regarding the fact that Mrs. Crabtree was appearing at the hearing as an officer of WCW, not as an individual. The transcript of the proceeding includes Mrs. Crabtree's testimony that she was appearing at the hearing as the President of WCW, that the Bank was entitled to possession of the property, and that she would have a duty to deliver the property to the Bank if ordered to do so. She also testified that WCW did not have possession of the property. Judge Williams interpreted Oklahoma law to allow her to direct a corporate officer to comply with a court order directed at a corporation. Therefore, on September 7, 2006, she entered an Order for Delivery, directing WCW and Darlene Crabtree, as President of WCW, to turn over the property to the Bank. Judge Williams testified that her Order was directed to Mrs. Crabtree as an officer of WCW, not as an individual, and that it was never her intent to punish Mrs. Crabtree personally.

The property was not delivered to the Bank per Judge Williams' Order, so on October 4, 2006, the Bank filed an Application for Contempt Citation against Darlene Crabtree, as President of WCW. That same day, Judge Williams issued a Contempt Citation against Darlene Crabtree, President of WCW, directing her to appear before the court and show cause why she should not be punished for indirect contempt of court. That Citation included the following directive: "SHOULD YOU FAIL TO APPEAR BEFORE THE COURT, A BENCH WARRANT MAY ISSUE FOR YOUR ARREST." On October 5, 2006, Mrs. Crabtree filed her plea of not guilty, and request for jury trial. Her attorney, Chris Blankenship, changed the caption of this pleading by removing WCW as the named defendant, and substituting "Darlene Crabtree" as the defendant.

WCW filed a Chapter 7 bankruptcy in this Court on October 23, 2006, Case No. 06-

5

80840. It also filed an "Advice of Bankruptcy" in the state court action before Judge Williams. No further proceedings were conducted in the state court action until after WCW's bankruptcy was concluded. The Crabtrees received a discharge in their Chapter 7 bankruptcy on December 4, 2006. WCW's bankruptcy was closed on January 26, 2007.[3]

On April 23, 2007, the state court action against WCW came on for review before Judge Williams. She determined that the replevin action could be considered again and set a hearing for May 21, 2007. Subpoenas were issued to Darlene Crabtree, President of WCW, and Isela Crabtree, Vice-President of WCW. Judge Williams presided over the hearing and set a bond of $ 50,000. At that hearing, Judge Williams noted that if the property was not turned over, the court would conduct a jury trial on the contempt action, and that a guilty verdict could result in a sentence of up to six months in the county jail and a fine of $500. The written Order from that hearing stated that the Defendant, WCW, appeared by and through its President, Darlene Crabtree, that she had previously plead not guilty and requested a jury trial on the contempt citation, and that Darlene Crabtree was ordered to post a bond of $ 50,000 on the contempt citation. During her testimony to this Court, Judge Williams admitted that the second part of this Order did not list Darlene Crabtree's designation as WCW President, but it did so in the first part. She restated her intent that this Order was directed to Mrs. Crabtree as an officer of the defendant corporation, WCW. She explained that she set the bond at $ 50,000 as a compromise between the amount of the debt of approximately $ 54,000, and the estimated value of the

---

[3]The Bankruptcy Trustee filed a report stating that WCW had no assets available for distribution to its creditors. As a corporation, WCW was not entitled to receive a discharge. 11 U.S.C. § 727(a)(1).

6

equipment of $ 46,000.

The Plaintiffs testified that a bond was never posted as ordered by Judge Williams, and that they had no funds or assets available to be able to obtain a bond. They stated that WCW never had actual possession of the equipment pledged to the Bank, but that they believed WCW did have the right to control it and get it if needed. This adversary was filed on July 17, 2007, and the parties agreed to a stay of the state court action pending the outcome of this adversary proceeding.

Mrs. Crabtree testified that she has experienced significant anxiety because of the replevin action and bankruptcies. Although she understood that she signed the loan documents and appeared at the state court proceedings as the President of WCW, she believed that the state court orders were directed at her personally, and she understood that if the property was not found and turned over to the Bank, she could go to jail. She received medical treatment for her anxiety, and took prescribed medication for approximately two months. She also missed work. She estimated that she spent approximately $ 150 for medical treatment, and that she and her husband incurred another $ 1,000 in expenses in attempting to comply with the replevin orders. She has not resigned as an officer of WCW, nor has WCW been formally dissolved as a corporation; however, the Crabtrees testified that WCW has no assets and has not operated since the Bank picked up its trailer.

Mr. Crabtree described Mrs. Crabtree as being unable to care for herself at times, and on the verge of a nervous breakdown as a result of the replevin proceedings. He also believed that the state court directed him and Mrs. Crabtree, not WCW, to personally post the bond on the contempt citation.

The Bank's officer, Mike Butler, testified that he believed WCW owned all of the equipment pledged as collateral for the loan for the trailers, based upon the Bill of Sale Mr. Crabtree presented to him. He had no knowledge of the agreement between WCW, Silver and Simpson. After WCW defaulted, Mr. Silver notified him that Silver owned some of the pledged collateral. Mr. Butler stated that it was never his intention, nor did he ever instruct the Bank's attorney, to proceed against Mrs. Crabtree personally. He has never asked that she be jailed, nor has she ever been jailed because of the replevin and contempt action. The Bank's only desire was to get the equipment back. Mr. Butler admitted that he knew the Crabtrees filed personal bankruptcy and that WCW was no longer in operation. He also admitted that he contacted the FBI because he suspected there may have been some fraudulent activity regarding the loan.[4] He disputed the Crabtrees' claim that they were unable to recover the equipment because they did not have access to a truck that could haul it. Mr. Butler believed that the equipment could be pulled by a pickup.

## CONCLUSIONS OF LAW

The Crabtrees filed this adversary seeking to recover actual and punitive damages from the Bank for violation of the automatic stay in 11 U.S.C. § 362, violation of the discharge injunction in 11 U.S.C. § 524, a permanent injunction enjoining the Bank from continuing its replevin and contempt action in state court or commencing any new action against the Crabtrees, and for an award of attorney fees and costs. The Bank argues that its replevin action was against WCW only, not the Crabtrees personally, and that there is no violation of the Bankruptcy Code in seeking an order directing a corporate officer to

---

[4] The Court notes that financial institutions are required to report suspicious activity to federal authorities. *See, e.g.,* 12 C.F.R. § 21.11.

8

perform her duties on behalf of the corporation. The parties have identified six legal issues for this Court to resolve:

1. Whether Darlene Crabtree ever had care, custody, or control of the assets sought in the Bank's replevin action showing that she had actual or constructive possession?

2. Whether the automatic stay was willfully violated by the Bank when it continued with its state court replevin action against Darlene Crabtree?

3. Whether the Bank violated the discharge injunction when Darlene Crabtree was ordered to pay a bond for WCW's inability to turn over assets?

4. Whether this Court should issue a permanent injunction enjoining the Bank from continuing or commencing any action against the Crabtrees for the return of assets allegedly held by WCW?

5. Whether the Bank should pay damages and attorneys fees and costs for violations of the automatic stay and discharge injunction?

6. Whether the Bank should pay punitive damages for violations of the automatic stay and discharge injunction?

The Crabtrees' burden of proof in establishing a violation of the automatic stay and/or discharge injunction is by a preponderance of the evidence. *See, Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *In re Johnson*, 501 F.3d 1163 (10th Cir. 2007).

The first issue identified by the parties is essentially a request for this Court to revisit the decisions made and orders entered by the state court. The Court declines to do so. The Crabtrees are asking the Court to look behind the decisions of the state court and

revisit issues already decided in that court. If the Crabtrees believe that there were procedural errors or they dispute the findings of that court, the proper authority to address such claims is the state court. *Paul v. Iglehart (In re Paul)*, 534 F.3d 1303, 1307 (10th Cir. 2008). "As a general matter, it is both inappropriate and unnecessary for a bankruptcy court to oversee the conduct of litigation in other courts." *Id*. at 1307-08.

Based upon the representations of both parties and the pleadings filed in the state court replevin action, there appears to be no question that the Bank did not violate the automatic stay when it commenced its replevin action against WCW. The Crabtrees do not dispute this. Although this action was instituted a few days after the Crabtrees filed personal bankruptcy, the action only named WCW, the corporation, as a defendant. Replevin is an action *in rem*, not *in personam*, as its purpose is to recover property. The Petition for Replevin clearly states that it is against WCW, and the Notice of the replevin action is directed at WCW, care of Darlene Crabtree. WCW filed an objection to the action, but there is nothing filed in the name of either of the Crabtrees, or any other individual. WCW did not file bankruptcy until October 23, 2006, therefore no automatic stay was in effect that prohibited the Bank from proceeding against it until that date.

However, the Crabtrees insist that the action against WCW became an action *in personam* against Mrs. Crabtree personally once the Bank sought and obtained the contempt order because it named and was directed at her personally. This, they argue, was a willful violation of the automatic stay, and later became a violation of the discharge injunction, since the Bank had notice of the Crabtrees' personal bankruptcy well before the Order of Delivery and contempt citation. The question that this Court must answer is whether the state court orders directed at WCW and Darlene Crabtree as President of

10

WCW were the equivalent of improper attempts to collect a debt personally against Mrs. Crabtree while a debtor in bankruptcy and after she received her discharge.

Neither the law nor the evidence supports a finding that the Bank violated the automatic stay and discharge injunction. There are several reasons why this Court does not believe that the Bank violated the automatic stay. The automatic stay against the commencement or continuation of a judicial proceeding against a debtor is limited to proceedings that are based upon claims that arose before the bankruptcy was filed. 11 U.S.C. § 362(a)(1). Even if it is assumed that the contempt application was directed at Mrs. Crabtree personally, no action for contempt existed at the time she and her husband filed personal bankruptcy, therefore it was not a "claim" that arose before the bankruptcy was filed.

The automatic stay also prohibits actions intended to obtain possession or exercise control of property of the estate. 11 U.S.C. § 362(a)(3). However, the Crabtrees never listed the equipment sought in the replevin action on their bankruptcy schedules, so they did not consider it to be personal property that was part of their bankruptcy estate. Therefore, the replevin action did not violate the automatic stay in the Crabtree bankruptcy since it only sought property owned by WCW, nor was it a claim against the Crabtrees since they did not own the property.

The most basic reason why the Court does not believe the Bank violated the automatic stay or the discharge injunction is that the Bank's actions were directed at Mrs. Crabtree in her capacity as a corporate officer of WCW, not against her personally. Based upon the evidence, the Bank's actions have always been against Mrs. Crabtree in her corporate capacity, not as an individual. The caption of the replevin action specifically

11

identifies WCW as the sole defendant.[5] The contempt application and order identify Mrs. Crabtree as the President of WCW. Judge Williams testified that it was never her understanding of the Bank's requested actions, nor her intent to target Mrs. Crabtree individually, but only in her capacity as a corporate officer. Mrs. Crabtree's own testimony to this Court was that she understood that she appeared in state court as a corporate officer of WCW, not as an individual, and that she was being ordered to turn over the equipment because she was the President of WCW. Even if Mrs. Crabtree had been named in the replevin action itself, the action would not have been *in personam* as to her. *Bouchelle v. Southeast Bank of Perry, N.A. (In re Bouchelle)*, 98 B.R. 81 (Bankr. M.D. Fla. 1989).

The Tenth Circuit Court of Appeals has recently considered a case involving debtors in a state court action filed against a corporation of which the debtors were joint owners with the plaintiff. *Paul v. Iglehart (In re Paul)*, 534 F.3d 1303 (10th Cir. 2008). The case only considered the discharge injunction, but the analysis is also helpful to this Court's consideration of whether the Bank violated the automatic stay, as well. The issue in *Paul* was whether the discharge injunction was violated when discovery was sought from and refused by the debtors and sanctions were sought for non-compliance with discovery obligations in the state court action. The Tenth Circuit Court held that § 524(a)(2) permits suits in which debtors are nominal defendants, even suits brought to collect on debts a debtor has discharged, and that debtors may be required to comply with orders entered against them in state court proceedings. *Paul*, 534 F.3d at 1307. Thus, there was no

---

[5]Mr. Blankenship's change of defendants in the entry of plea and request for jury trial was not effective to substitute Mrs. Crabtree as the defendant in place of WCW.

12

Case 07-08024   Doc 81   Filed 12/19/08   Entered 12/19/08 11:04:36   Desc Main Document      Page 12 of 17

violation of the discharge injunction.

In *Paul*, the plaintiff in the state court action sued a corporation in which she had been an owner, officer and employee, and certain individuals involved in the corporation. Two of these individuals later filed bankruptcy and discharged the claim of the plaintiff in the state court action; however, they remained as defendants in the state court action. After their discharge, the debtors were served with discovery requests as individuals and co-owners of the corporate defendant in the state court action. They refused to cooperate in discovery regarding the corporate defendant's activities, claiming that they were personally immune from liability because of the discharge injunction. The state court assessed monetary penalties against them that were later vacated. But, the debtors filed an adversary proceeding alleging that pursuit of discovery against them regarding the corporation was a violation of the discharge injunction, and interfered with their fresh start after bankruptcy.

In rejecting the debtors' arguments, the Tenth Circuit focused on the precise language of the code section, the type of action brought against the debtors, and the possible coercive effect the creditor's action may have had on the debtors. Section 524(a)(2) expressly states that the injunction against a creditor's post-discharge collection activity only prohibits efforts to collect a debt "as a personal liability of a debtor." *See In re Antonious*, 373 B.R. 400, 406 (Bankr. E. D. Pa. 2007). "[T]o the extent that a creditor seeks *in rem* relief, no violation of the discharge injunction occurs." *Id.,* citing *Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S. Ct. 2150, 115 L.Ed.2d 66 (1991). Thus, to the extent that the Bank was merely attempting to recover property, whether from WCW or the Crabtrees, there is no violation of the discharge injunction.

13

This analysis supports the Court's finding that the Bank could pursue the application for contempt against Mrs. Crabtree without violating the automatic stay or the discharge injunction. The application for contempt was an attempt to enforce an order of the state court in an action that was otherwise permitted under the Bankruptcy Code. As the *Paul* opinion finds, a debtor is not relieved of her obligations to participate in a state court action against a third party merely because she is in bankruptcy or has received a discharge. *Id.* at 1307. Further, even a state court criminal contempt proceeding has been held to be a legitimate exercise of a court's power to enforce its own orders and "vindicate its dignity." *See Roussin v. Johnson (In re Roussin)*, 95 B.R. 270, 270 (Bankr. D. N.H. 1988), *aff'd*, 97 B.R. 130 (D. N.H. 1988). Thus, pursuing an application for contempt against Mrs. Crabtree as a corporate officer was a facially permissible action by the Bank.

The *Paul* case requires one more inquiry by the Court to determine whether there was a violation of § 524(a)(2). The Court must decide whether the creditor's actions have "the practical, concrete effect of coercing payment of a discharged debt[.]" *Paul*, 534 F.3d at 1308 (citations omitted). The debtor's burden here is to "prove not merely that [the creditor's] act is not what it appears to be, but that the act in question is one to collect a discharged debt *in personam.*" *In re Schlichtmann*, 375 B.R. 41, 97 (Bankr. D. Mass. 2007), cited by *Paul*, 534 F.3d at 1308. The court is to use an objective standard in evaluating the creditor's conduct in the context of the particular facts presented. *Paul*, 534 F.3d at 1308; *Schlichtmann*, 375 B.R. at 95.

This Court does not believe the Crabtrees met their burden. As the Court previously outlined, the evidence indicated that the Bank's action was intended to direct Mrs. Crabtree

14

to turn over property that the Bank was entitled to receive. While there was some testimony from Mr. Crabtree that Mr. Butler told him the Crabtrees should take out a second mortgage on their home to pay off the debt owed to the Bank, there was no information regarding the timing of that discussion or which debt was referred to. There was testimony that the Crabtrees had personal loans with the Bank. The involvement of the FBI by the Bank did not appear to coerce or intimidate Mr. Crabtree, as he indicated that after he answered some questions, the FBI seemed satisfied that he was not involved in any wrongdoing. As previously noted, banks are required to report suspicious activity to federal banking authorities. Mr. Butler effectively rebutted any presumption of coercion by testifying that his purpose in initiating this contact was to investigate possible fraudulent activity in obtaining the loan. He identified a compelling reason and legitimate economic reasons to seek court orders directing Mrs. Crabtree, as President of WCW, to turn over the equipment: based upon representations by Mr. Crabtree, he believed WCW was the owner of the equipment, and that the Crabtrees had the ability to locate and pick up the equipment. *See Schlictmann*, 375 B.R. at 97. There was no evidence that the Bank had attempted to coerce payment of a discharged debt by offering to withdraw its application for contempt, or dismiss its replevin action.

Unlike the *Pratt* case cited in the *Paul* opinion, the Bank's actions in seeking a contempt citation to enforce an order of the state court have not coerced the Crabtrees into reassuming the debts of WCW or paying the Bank the value of the equipment through some other means, nor do they appear to be designed to do so. *See Pratt v. Gen. Motors Acceptance Corp. (In re Pratt)*, 462 F.3d 14 (1st Cir. 2006). Mr. Butler stated that the Bank's only goal was to recover the equipment, not to recover from the Crabtrees

15

personally. He also told the Court that he has never asked the state court to jail Mrs. Crabtree, nor has she ever been jailed for failing to abide by the state court order. All pleadings filed by the Bank in the state court action identified Darlene Crabtree as President of WCW. *See e.g. Bouchelle,* 98 B.R. at 83. This Court believes that the evidence showed that the Bank was only attempting to enforce its rights *in rem*. Judge Williams testified that this was her opinion, as well.

This Court's decision is further supported by the fact that there has been no decision on the merits in the state court proceeding. There is no final judgment after jury trial finding Mrs. Crabtree in contempt, no order directing her to jail, or to pay a fine. The Court acknowledges that it need not wait for a disposition of the state court case before considering the issue of a discharge violation. However, this Court should not resolve the merits of the claims pending in state court in order to decide whether the Bank violated the discharge injunction. *Paul*, 534 F.3d at 1311. To do so would require the Court to consider issues of state law regarding replevin, indirect contempt proceedings, enforcement of court orders, corporate law, and possible officer liability. Oklahoma corporate law provides for specific methods to collect debts against corporations and their officers. *See* Okla. Stat., tit. 18, ch. 22, § 1001 *et seq*, Oklahoma General Corporation Act. It would seem to this Court that the Bank must follow these procedures in the event the equipment is not recovered. Additionally, the Oklahoma Pleading Code specifically allows discharge in bankruptcy to be raised as an affirmative defense. Okla. Stat. tit. 12, § 2008(C). However, these are issues of state law that are best left to the state court to decide. *See Paul*, 534 F.3d at 1307-08. This Court declines to enter injunctive relief regarding the state court

proceedings or dictate how the state court must interpret state law.

Therefore, it is this Court's opinion that the Crabtrees have not proven by a preponderance of the evidence that the Bank violated the automatic stay or the discharge injunction. Plaintiffs are not entitled to relief against the Bank on their causes of action. A separate judgment will be entered in accordance with this opinion.

###

Case 07-08024    Doc 81    Filed 12/19/08    Entered 12/19/08 11:04:36    Desc Main
Document      Page 17 of 17